Deborah A. Ferguson, Bar No. 5333
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
Tel.: (208) 484-2253
daf@fergusondurham.com

Michael J. Grygiel (*pro hac vice* pending)
Daniela Del Rosario Wertheimer (*pro hac vice* pending)
CORNELL LAW SCHOOL FIRST
AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
mjg395@cornell.edu
ddw83@cornell.edu

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PENGUIN RANDOM HOUSE LLC;**<br>**HACHETTE BOOK GROUP, INC.;**<br>**HARPERCOLLINS PUBLISHERS LLC;**<br>**MACMILLAN PUBLISHING GROUP, LLC;**<br>**SIMON & SCHUSTER, LLC; SOURCEBOOKS**<br>**LLC; THE AUTHORS GUILD; MALINDA LO;**<br>**DAVID LEVITHAN; DASHKA SLATER; THE**<br>**DONNELLY PUBLIC LIBRARY DISTRICT;**<br>**CHRISTIE NICHOLS; OLIVIA LANZARA;**<br>**J.E.**, by and through his mother and next friend<br>Barbara Ersland; **BARBARA ERSLAND**; and<br>**MELISA CULL,**<br><br>Plaintiffs,<br><br>v.<br><br>**RAÚL LABRADOR**, in his official capacity as<br>Attorney General of the State of Idaho; **JAN**<br>**BENNETTS**, in her official capacity as Ada<br>County Prosecuting Attorney; **JUSTIN** | Case No. [•]<br><br>**COMPLAINT FOR**<br>**INJUNCTIVE AND**<br>**DECLARATORY RELIEF** |

**COLEMAN**, in his official capacity as Nez Perce County Prosecuting Attorney; **BRIAN NAUGLE**, in his official capacity as Valley County Prosecuting Attorney; **JOHN OR JANE DOE**; and **THE EAGLE PUBLIC LIBRARY BOARD OF TRUSTEES,** a department of the **CITY OF EAGLE**,

Defendants.

Plaintiffs Penguin Random House LLC, Hachette Book Group, Inc., HarperCollins Publishers LLC, Macmillan Publishing Group, LLC, Simon & Schuster, LLC, Sourcebooks LLC, The Authors Guild, Malinda Lo, David Levithan, Dashka Slater, the Donnelly Public Library District, Christie Nichols, Olivia Lanzara, J.E. by and through his mother and next friend Barbara Ersland, Barbara Ersland, and Melisa Cull, by their attorneys, for their Complaint against Defendants Raúl Labrador in his official capacity as Attorney General of the State of Idaho, Jan Bennetts in her official capacity as Ada County Prosecuting Attorney, Justin Coleman in his official capacity as Nez Perce County Prosecuting Attorney, Brian Naugle in his official capacity as Valley County Prosecuting Attorney, John or Jane Doe, and the Eagle Public Library Board of Trustees, a department of the City of Eagle, state as follows:

## I.    INTRODUCTION

1.    *Slaughterhouse-Five*, *The Bluest Eye*, and *A Clockwork Orange* are thought-provoking, award-winning classics, renowned for their literary value.  Many are first introduced to these books as minors at their schools or local libraries, under the guidance of trained professional educators and librarians.

2.    Not anymore.  Idaho now demands that public schools and public libraries either sequester these books — and others like them — away from young people or face the risk of challenge, litigation, and statutory damages for allowing these classic and valuable books to be accessed by minors.

3.      The right to speak and the right to read are inextricably intertwined.  Authors have the right to communicate their ideas to students without undue interference from the government. Students have a corresponding right to receive those ideas.  Publishers, librarians, educators, and parents all play distinct roles in connecting authors to students, thereby encouraging literacy and all its pedagogical benefits, including knowledge acquisition, development of critical thinking skills, and community building.

4.      This suit concerns Idaho House Bill 710, which amended Idaho Code Section 18-1514 and added Section 18-1517B ("HB 710" or the "Act").  HB 710 violates the First and Fourteenth Amendments rights of publishers, authors, parents, librarians, educators, and students by forcing public schools and libraries to undertake drastic measures to restrict minors' access to books, or face injunction and/or monetary penalty.

5.      HB 710 is a vague and sweeping law that prohibits public schools and libraries in Idaho from making constitutionally protected books and other materials available to minors.  By this action, Plaintiffs seek to preliminarily and permanently enjoin enforcement of, and declare unconstitutional and void, HB 710 as a violation of their rights under the First and Fourteenth Amendments to the United States Constitution.

6.      HB 710, which took effect July 1, 2024, purports to "protect" children from library books and other materials deemed "harmful to minors" via a legislatively created bounty system. Not only does HB 710 authorize county prosecutors and the attorney general to seek injunctive relief against any school or public library that allows minors access to books the prosecutor deems "harmful to minors," but HB 710 goes on to deputize private individuals with the power to bring a private right of action against schools or libraries who — in the individual's own estimation — violate HB 710's terms.  In doing so, HB 710 risks the imposition of onerous book challenge review procedures, liability, and monetary penalties on public libraries and schools for carrying

3

books and other constitutionally protected materials that *anyone* deems "harmful to minors."  The Act thus puts educators and librarians in the untenable position of having to guess whether any member of the public might file an objection to a book whose message they disagree with by simply claiming that the book falls within HB 710's vague and overbroad definition of materials "harmful to minors."

7.      By voting the Act into law, the Idaho Legislature ignored that the First Amendment prohibits the suppression of "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription . . . solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.  In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975) (citation omitted).

8.      Specifically, rather than limiting its reach to only obscene materials unprotected by the First Amendment, HB 710's definition of materials it deems "harmful to minors" is cryptic and tautological.  It is unconstitutionally overbroad and vague.

9.      Although HB 710 echoes certain aspects of the United States Supreme Court's three-part test for obscenity as articulated in *Miller v. California*, 413 U.S. 15, 23–24 (1973), it does not clearly and comprehensively apply it.  Such an ambiguous — and pretextual — gesture cannot save the Act from constitutional scrutiny.

10.     The *Miller* standard defines "obscenity" as "works which, taken as a whole, [a] appeal to the prurient interest in sex, [b] which portray sexual conduct in a patently offensive way, and [c] which, taken as a whole, do not have serious literary, artistic, political, or scientific value." 413 U.S. at 23.

11.     While HB 710 incorporates the first two *Miller* prongs, the structure of the statute requires consideration of the literary, artistic, political or scientific value of any given book in only

limited circumstances.  By failing to exclude works that have "have serious literary, artistic, political, or scientific value" from the definition of materials "harmful to minors," HB 710 empowers state prosecutors and deputized individuals to reach substantially more speech than the First Amendment permits.  *See id.* at 24.

12.     HB 710 also violates the First Amendment by failing to distinguish between minors of different ages.  In effect, HB 710 lumps together all Idahoans under the age of 18, without regard to the constitutional reality that material not appropriate for the youngest of minors may be appropriate and of significant value to older minors.

13.     Against this backdrop, and by requiring libraries, at a minimum, to "take reasonable steps to restrict access by minors to materials [deemed] harmful to minors" under the law, HB 710 forces libraries either to sequester such materials to a fully monitored, cordoned-off, adults-only section or to remove these materials from the library entirely.  *See* Idaho Code § 18-1517B(3)(a).

14.     Libraries and schools that lack the space and/or resources to construct such "adult-only" areas have thus been forced to take the extreme step of becoming "adult-only" libraries that restrict entry of any minor children unaccompanied by their parent or guardian, no matter their age.

15.     By so broadly regulating the display and availability of materials that are constitutionally protected as to older minors and adults, HB 710 violates the First Amendment because it imposes impermissibly overbroad and vague restrictions.

16.     The Act's overbreadth and vagueness are only exacerbated by its two-pronged enforcement mechanism, which invites arbitrary and discriminatory enforcement not only by state officials and law enforcement, but also by ordinary citizens who have no experience in reading — much less understanding and enforcing — state statutes.

17.     HB 710 also violates the First Amendment by imposing viewpoint-based restrictions on "ideolog[ies], opinion[s], [and] perspective[s]" expressed in the materials public schools and libraries may make available to minors, including by targeting and subjecting "any act of … homosexuality," Idaho Code § 18-1514(3) — but not "any act of heterosexuality" — to its definition of "sexual conduct" prohibited by the statute.  *See Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 820 (1995).

18.     In addition, HB 710 infringes on Idaho students' First Amendment rights to receive information because it limits their access to classic books such as Kurt Vonnegut's *Slaughterhouse-Five* and Margaret Atwood's *The Handmaid's Tale*, as well as young adult bestsellers such as *I'll Give You the Sun* by Jandy Nelson and *The Perks of Being a Wallflower* by Stephen Chbosky, among countless other works of literature and non-fiction such as Maya Angelou's *I Know Why the Caged Bird Sings* and *"What's Happening to My Body?" Book for Girls* by Lynda Madaras.

19.     The Act also infringes on book publishers' and authors' First Amendment right to disseminate and have a wide range of their constitutionally protected books read by minors in Idaho.  Without the ability to reach their core audience, publishers and authors suffer both creatively and financially.

20.     Finally, HB 710 impacts the First Amendment rights of school librarians and libraries themselves, forcing them to choose between restricting access to materials which they believe have serious value for minors and risking onerous book challenge reviews, litigation, and liability under HB 710.

21.     Plaintiffs bring this action to safeguard their fundamental rights and the rights of others under the First and Fourteenth Amendments.

22.    Plaintiffs respectfully request that this Court declare HB 710 unconstitutional under the First and Fourteenth Amendments, issue preliminary and permanent injunctions barring its enforcement, and award Plaintiffs their costs and attorneys' fees.

## II.    JURISDICTION AND VENUE

23.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate civil rights protected by the First and Fourteenth Amendments to the United States Constitution.

24.    This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 1343; Federal Rules of Civil Procedure 57 and 65; and the general legal and equitable powers of the Court.

25.    Venue is proper in the District of Idaho under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to this action arose from events occurring in this judicial district.

26.    Venue is proper in the Southern Division pursuant to District of Idaho Local Civil Rule 3.1 because two Defendants legally reside in Ada County, Idaho, and some of the acts or omissions giving rise to this action occurred in this division.

## III.    PARTIES

### A.  PLAINTIFFS

#### 1.  Book Publisher Plaintiffs.

27.    Plaintiffs Penguin Random House LLC, Hachette Book Group, Inc., HarperCollins Publishers LLC, Macmillan Publishing Group, LLC, Simon & Schuster, LLC, and Sourcebooks LLC are publishers whose books have been targeted for restricted adults-only access or wholesale removal from public libraries and public school libraries throughout Idaho in connection with HB

710.  The Authors Guild ("Publisher Plaintiffs") is a professional organization of writers, including members who have been similarly targeted.

28.     Plaintiff Penguin Random House LLC ("PRH"), a Delaware Limited Liability Company headquartered in New York, is the U.S. arm of Penguin Random House, the world's largest trade publisher, which comprises more than 300 editorially and creatively independent publishing imprints globally.

29.     In connection with HB 710, many books published by PRH have been moved to restricted adult-only sections or removed wholesale from Idaho public libraries and public school libraries, including *The Bluest Eye* by Toni Morrison; *Last Night at the Telegraph Club* by Malinda Lo; *The Handmaid's Tale* by Margaret Atwood; *A Clockwork Orange* by Anthony Burgess; *The Freedom Writers Diary* by Erin Gruwell and Freedom Writers; and *I Know Why The Caged Bird Sings* by Maya Angelou.

30.     PRH's mission is to ignite a universal passion for reading by creating books for everyone.  PRH aims to publish books that provide children with a gateway to the whole world, promoting literacy, fostering empathy, and inspiring free and open debate.  Continued inclusion of its books in Idaho's public libraries and public school libraries is critical to PRH's mission, especially for books intended for elementary and young adult readers.

31.     Plaintiff Hachette Book Group, Inc. ("Hachette") is a U.S. general-interest book publisher headquartered in New York City.  Hachette's publishing groups include prominent imprints such as Little, Brown and Company; Little, Brown Books for Young Readers; Grand Central Publishing; Basic Books; ORBIT; Running Press; Algonquin Books; and Workman Publishing.  Hachette is part of Hachette Livre, the world's third-largest trade and educational publisher.  Hachette's books and authors have garnered major awards, including the Pulitzer Prize, National Book Award, Caldecott Medal, Newbery Medal, Booker Prize, and Nobel Peace Prize.

32.     Since HB 710 was enacted, books published by Hachette, including *The Almost Moon* by Alice Sebold and *Water for Elephants* by Sarah Gruen have been taken off library shelves in Idaho.

33.     Hachette's publishing programs aim to reflect the broad range of backgrounds, experiences, and viewpoints that shape our society.  Its mission is to make it easy for everyone to discover new worlds of ideas, learning, entertainment, and opportunity, and it is fundamental to Hachette's mission that its books remain accessible to students in public school classrooms and libraries.

34.     Plaintiff HarperCollins Publishers LLC ("HarperCollins"), a subsidiary of News Corp, is the second largest consumer book publisher in the world, with operations in 15 countries. With 200 years of history and more than 120 branded imprints around the world, HarperCollins publishes approximately 10,000 new books every year in 16 languages and has a print and digital catalog of more than 250,000 titles.  HarperCollins seeks to deliver content that presents a diversity of voices and speaks to the global community.  Writing across dozens of genres, its authors include winners of the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Booker Prize.

35.     HB 710 has required librarians in Idaho to move certain of HarperCollins' titles to adult-only areas or to remove them from circulation entirely, including *The Carnival at Bray* by Jessie Ann Foley; *Damsel* by Elana K. Arnold; *Storm and Fury* by Jennifer Armentrout; *Allegedly* and *Monday's Not Coming* by Tiffany D. Jackson; *The Poet X* by Elizabeth Acevedo; "*What's Happening to My Body?" Book for Girls* by Lynda Madaras; and *Concrete Rose* by Angie Thomas.

36.     Plaintiff Macmillan Publishing Group, LLC ("Macmillan") is a New York-based group of U.S. publishers that includes Celadon Books; Farrar, Straus and Giroux; Flatiron Books; Henry Holt & Company; Macmillan Audio; Macmillan Children's Publishing Group; The St.

Martin's Publishing Group; and Tor Publishing Group.  The U.S. publishing group is part of Macmillan Publishers, a global trade book publishing company with prominent imprints around the world.  Macmillan publishes a broad range of award-winning books for children and adults in all categories and formats.

37.     Since HB 710 went into effect, scores of books published by Macmillan have been pulled from Idaho public and school library shelves or sequestered in adult-only areas.  These titles include *The Handsome Girl & Her Beautiful Boy* by B.T. Gottfred; *Red, White & Royal Blue* by Casey McQuiston; *Spinning* by Tillie Walden; and *This One Summer* by Mariko Tamaki.

38.     Macmillan strongly advocates for the right to read, uniting a broad community of authors, educators, librarians, and readers.  Macmillan strives to ensure access to diverse literary works, highlighting the critical role of literacy in democracy, championing the transformative power of books in fostering understanding, and working to build an inclusive future.

39.     Plaintiff Simon & Schuster, LLC ("S&S"), a New York Limited Liability Company headquartered in New York City.  It is a global leader in general interest publishing, dedicated to providing the best in fiction and nonfiction for readers of all ages in all printed, digital, and audio formats.  Its distinguished roster of authors includes many of the world's most popular and widely recognized writers, and winners of the most prestigious literary honors and awards.  S&S is home to numerous well-known imprints and divisions such as Simon & Schuster, Scribner, Atria Publishing Group, Gallery Books, Adams Media, Avid Reader Press, Simon & Schuster Books for Young Readers, and Simon & Schuster Audio, and international companies in Australia, Canada, India, the United Kingdom, and VBK in the Netherlands and Belgium.  S&S proudly brings the works of its authors to readers in more than 200 countries and territories.

40.     S&S books have been taken out of circulation or reshelved in adult sections of Idaho public and school libraries since HB 710 became law.  Some of these books include

*Forever…* by Judy Blume; novels by Ellen Hopkins, including *Collateral*, *Fallout*, *Identical*, *People Kill People*, *Traffick*, *You I've Never Known*, and *Perfect*; *Nineteen Minutes* by Jodi Picoult; and *The Perks of Being A Wallflower* by Stephen Chbosky.

41.     Plaintiff Sourcebooks, LLC ("Sourcebooks") is the largest woman-led publisher in the United States with offices in Illinois and New York.  Publishing both fiction and non-fiction for children, young adults, and adults across 19 imprints and growing, Sourcebooks believes that books change lives and is committed to reaching readers with books that will illuminate, inspire, and enlighten lives.

42.     Plaintiff The Authors Guild (the "Guild") was founded in 1912 and is a national non-profit association of more than 14,000 professional published writers of all genres.  The Guild counts historians, biographers, academics, journalists, and other writers of non-fiction and fiction as members.  The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and taxation.  Many Guild members earn their livelihoods through their writing.  Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field.  The ability to write on topics of their choosing and to have their work available through bookstores and libraries, including school libraries, is vital to their ability to make a living in their chosen profession.  Books written by the Guild's members, including Plaintiffs Malinda Lo and David Levithan, have been targeted for removal or removed from public school libraries throughout Idaho as a result of HB 710's prohibition on books and other materials deemed "harmful to minors."

**2.  Author Plaintiffs.**

43.    Plaintiffs Malinda Lo, David Levithan, and Dashka Slater ("Author Plaintiffs") are authors whose books have been targeted for restricted adults-only access or wholesale removal from public libraries and public school libraries throughout Idaho in connection with HB 710.

44.    Plaintiff Malinda Lo resides in Massachusetts.  She is a *New York Times* bestselling author and has written seven novels, all of which feature queer female characters.  Lo's works have been selected for many best-of lists, including the American Library Association's ("ALA") Best Fiction for Young Adults, the ALA's Rainbow List, Bank Street College's Best Children's Books, the Locus Recommended Reading List, and the James Tiptree Jr. Longlist.

45.    Lo's novel *Last Night at the Telegraph Club* is a historical coming-of-age novel set in 1950s San Francisco about a Chinese American girl named Lily Hu who discovers her identity as a lesbian.  *Last Night at the Telegraph Club* won the National Book Award, the Stonewall Book Award, the Asian/Pacific American Award for Literature, and a Michael L. Printz Honor.  It was also an *LA Times* Book Prize finalist.  HB 710 has already forced some public and public school libraries to remove *Last Night at the Telegraph Club* or put the novel in adult-only areas; the risk that more Idaho libraries take the same action only grows each day HB 710 remains the law.

46.    Plaintiff David Levithan resides in New Jersey.  He is the author of five book series, twenty-five stand-alone novels, and many short stories.  Levithan has won numerous awards for his work, including the Indies Choice Book Awards Honor, the Lambda Literary Award for Children/Young Adult Literature, the National Council of Teachers of English's Assembly on Literature for Adolescents Award, and the ALA's Margaret A. Edwards Award.

47.    Levithan writes to normalize the experience of being a member of the LGBTQ+ community and to provide young adults stories in which they can see themselves.  By weaving together experiences of people from different backgrounds, Levithan aims to help young adults

humanize others and become empathetic and well-rounded members of society.  Despite his books' significant value to young readers, their discussion of topics like LGBTQ+ identity make them a target for HB 710.  The result is that students — Levithan's most important readers, who often lack the resources or ability to access his books outside of public or school libraries — are cut off from Levithan's important messages.

48.     Plaintiff Dashka Slater is an author and journalist residing in California.  She is the recipient of many prestigious literary awards including the ALA's Stonewall Book Award, the *Boston Globe*-Horn Book Honor Book Award for Nonfiction, the California Library Association's Beatty Award, and the Wanda Gág Read Aloud Book Award.  Slater writes to inspire conversations.  She believes that reading provides young people with the tools to be active and informed citizens, to engage with deep and complicated social issues, and to consider the experiences and perspectives of many kinds of people, including those unlike themselves.  Slater's books deal with many themes, including transgender identity, racism, and criminal justice, making them susceptible to censorship under HB 710.  The threat posed by HB 710 hampers Slater's ability to reach her core audience — students and young people — harming her personal and literary goals, as well as her First Amendment rights, in the process.

49.     For each Author Plaintiff, public libraries and public school libraries are critical means of reaching their intended audiences and securing the broadest possible readership.  The Author Plaintiffs' books, including the books identified herein, are vehicles for their personal messages and ideas.  The removal of their books from public and school libraries, including the stigma associated with this removal, causes them harm, both personally and professionally.

### 3.  Public Library Plaintiff.

50.     The Donnelly Public Library District (the "Donnelly Library") is a small, rural library serving the Town of Donnelly, Idaho, in Valley County.  As a public library district, it is a

public corporation and may sue and be sued in its corporate name pursuant to Idaho Code § 33-2722.  Donnelly has a population of approximately 250 people.

51.     The Donnelly Library, which only officially opened to the public on July 6, 2018, operates out of a 1,024-square-foot log cabin and a handful of teepees currently used in an effort to sustain the library's after-school programing.  The library is a tenth of the size of Idaho's average library, which is 10,552 square feet.

52.     The Donnelly Library — which subsists on grants, after-school tuition payments, limited local option tax money, and donations from community members — has extremely limited financial resources.

53.     Although the library has never made available any material that is "obscene" or "harmful to minors" as those terms are defined in *Miller* and its progeny, it does carry books that some Idahoans may find offensive despite their obvious literary merit.  These include *To Kill a Mockingbird* by Harper Lee and *The Hate U Give* by Angie Thomas, as well as other books that grapple with difficult but important themes such as puberty, sex, gender, and race.

54.     By including those literary works in its collection, the risk of liability and statutory damages flowing from HB 710's vague and ambiguous prohibitions represent too high a risk for the library to carry, particularly given its already strained financial situation.  Put simply, the Donnelly Library cannot afford the risk of litigation under HB 710.

55.     Even if the Donnelly Library had the financial resources to hire staff to review each book in its collection to determine whether it may fall within HB 710's overbroad, vague, and ambiguous scope — which it does not — its exceedingly small size would nevertheless make it impossible to cordon off any such materials into an adult-only section, let alone in a way that would reasonably "restrict access by minors."  Idaho Code § 18-1517B(3)(a).

56.     Accordingly, in direct response to the passing of HB 710, the Donnelly Library made the sad and drastic decision to transition to an adult-only library in May 2024 in order to avoid the risk of litigation and statutory damages under the Act.

57.     Now, before any minor may even step foot inside the Donnelly Library, including to attend the only after-school program available in the town, his or her parent or guardian must first complete a three-part waiver.

58.     These restrictions have already severely limited patrons' access to library materials. For example, from July 1, 2023, through August 15, 2023, patrons checked out 1,748 materials from the Donnelly Library.  That number dropped to 999 during the same timeframe in 2024.

### 4.  Public School Librarian Plaintiff.

59.     Public School Librarian Plaintiff Christie Nichols is a librarian at Rocky Mountain High School ("Rocky Mountain") in Meridian, Idaho, which serves ninth through twelfth grades. She is also the parent of two high school students.  Rocky Mountain is part of the West Ada School District (the "District").

60.     Although the Rocky Mountain library has never made available any material that is "obscene" or "harmful to minors" as those terms are defined in *Miller* and its progeny, due to the threat of litigation and statutory damages under HB 710, the West Ada School District has sent all libraries a list of over 60 titles that must be removed from District libraries, including Rocky Mountain, in an attempt to comply with HB 710's vague and overbroad provisions.

61.     Prior to this mandate, Rocky Mountain's collection housed well over half of the titles included in the District list, including *I'll Give You the Sun*, a beautifully written novel by Jandy Nelson that includes storylines involving LGBTQ characters.  *I'll Give You the Sun* received the 2015 Michael L. Printz Award, an annual award from the American Library Association honoring the year's best book written for teens, based entirely on its literary merit.  The District

list also includes popular and classic titles such as *The Perks of Being a Wallflower* by Stephen Chbosky and *Slaughterhouse-Five* by Kurt Vonnegut.

62.     Nichols has been instructed by the District to remove these and any other titles included on the District list, even though she believes these books have serious literary, artistic, political, or scientific value for her students.

63.     Per District policy, Nichols has been instructed to send these titles to her District headquarters, which restricts minor access to those titles unless parental permission is first granted. Likewise, Nichols is unable to provide student access to books via inter-library loan without written parental permission.

**5.  Student and Parent Plaintiffs.**

64.     Plaintiffs J.E. and Olivia Lanzara ("Student Plaintiffs") are high school students in Idaho who have been harmed by HB 710 because of its impact on their ability to access a wide range of books through both their public and school libraries.  They have also suffered harm due to the stigma HB 710 generates surrounding books deemed "harmful to minors" under the law.

65.     Student Plaintiff J.E. is a 17-year-old junior at Lewiston High School in Lewiston, Idaho.

66.     J.E. has read, or plans to read, many of the books that either have already been removed from libraries in multiple Idaho school districts or are included on lists of materials that some Idahoans want removed from public library shelves.

67.     J.E. relies on these books to exemplify the lessons he learns at school through relatable characters, to provide an alternative medium of enjoyment outside of social media and technology, and to provide sources for his work as a student-journalist.  J.E. is also an aspiring author, and books are an important creative outlet for him.

68.     Along with his peers, J.E. relies on his school library as an educational and communal resource.  He sees the library as a place for him and fellow students to come together and share their thoughts in a welcoming environment.

69.     But given the removal of books at numerous other Idaho school libraries, J.E. is concerned that his own school library will soon deny him access to age-appropriate books that foster his learning.  He worries that he will be barred from accessing essential parts of his educational foundation and will be at a deficit compared to his future peers who have not had their access to books restricted.

70.     J.E. is concerned with how librarians who stock *The Kite Runner* by Khaled Hosseini, for example, are branded "groomers," and with how students who read *The Kite Runner* are othered and stigmatized.  *The Kite Runner* involves adult themes, like sexual assault of a minor, but does not endorse — and in fact, repudiates — sexual assault throughout.  The central exploration of the novel is about redemption and bravery in the face of tragedy, not the brief instance of sexual assault at the novel's start.

71.     J.E. views school libraries as essential to providing access to the marketplace of ideas and believes book removals diminish our world, making it less colorful and more insular.

72.     While J.E. is a minor, he is closer to 18 than he is to elementary school age.  In fact, J.E. takes dual-credit courses through a program with Lewis-Clark State College, which requires him to consume college-level materials that are considered age-appropriate for him.  HB 710, however, does not account for the differences in maturity and reading level between the youngest and the oldest of minors.  Thus, even though J.E.'s school district has approved him to engage with material that is appropriate for both college and high school students, the same district may soon, ironically, prevent him from accessing those very materials at his own school library.

73.    Barbara Ersland, J.E.'s mother and next friend, lives in Lewiston, Idaho, in Nez Perce County.  Ersland wants her son J.E. to have access to a wide range of books and materials through his school library so that, among other reasons, J.E. is presented with different viewpoints and experiences and is thus better prepared to engage with a wide range of people.

74.    Student Plaintiff Olivia Lanzara is a resident of Meridian, Idaho in Ada County. She is currently an 18-year-old senior at Rocky Mountain High School — the same school noted above where librarians have been directed to remove any books included on a list prepared by the West Ada School District in response to HB 710.

75.    During her senior year, Olivia had expected to be able to easily — and without fear of stigmatization — check out many of the books now included on the West Ada District list of restricted books, including *I Know Why the Caged Bird Sings* by Maya Angelou, *I'll Give You the Sun* by Jandy Nelson, and *Traffick* by Ellen Hopkins.

76.     Olivia had intended to access these books, and others like them, directly from her public school library, as she has done throughout her school life.

77.    Direct and uncomplicated access to these works would allow Olivia to see beyond her day-to-day experiences by introducing her to new narratives, perspectives, and ideas.  For Olivia, books initiate challenging conversations in safe environments and empower her to navigate unsafe or difficult situations.

78.    However, given the fear and ambiguity surrounding HB 710, Olivia can no longer access these books directly via her school library.  Rather, although Olivia is now 18 and no longer a minor subject to HB 710's "protections," she must nevertheless jump through hoops to access these books via the West Ada School District library.  It is unclear to Olivia and others how any student, including those 18 years or older, is meant to go about this task.  Whatever the procedure may be, actually following through with such procedure is likely to stigmatize those students

seeking access to "banned" or "protected" books, whether the students are under or over 18 years of age.

### 6. Eagle Plaintiff.

79.     Plaintiff Melissa Cull is a resident of Eagle, Idaho.  She and her three school-aged children are all avid readers and have been patrons of the Eagle Public Library since 2017.

80.     On July 24, 2024, an anonymous individual submitted 23 written notices to the Eagle Public Library Board (the "Board") pursuant to Idaho Code § 18-1517B(3), requesting that 23 books be relocated or removed from circulation because they purportedly violated HB 710.

81.     Pursuant to the requests, the Board removed three of those books from the library shelves and placed them behind the circulation desk, including *What Girls Are Made Of* by Elana K. Arnold.  Minors are now restricted from accessing these three books without written parent or guardian consent.

82.     The remaining twenty books complained of were removed from the children's and young adult sections and reshelved in the library's adult area.

83.     *What Girls Are Made Of* — one of the three books now restricted from minor access at Eagle Public Library — was a finalist for the 2017 National Book Award for Young People's Literature.  Reviewers have described it as a powerful and unforgettable look at the things that define teenage girls, and as a meditation on the idea of unconditional love and whether such love is dangerous or appealing.  The main character is a 16-year-old girl who works in an animal shelter and is aching after the boyfriend she would do anything for dumped her.  In this bildungsroman, the main character looks critically at lessons taught to her by her mother as she navigates the road to adulthood.  The book does not shy away from challenging topics teenage girls confront in real life and Cull believes it is an important and impactful story for young people — especially teen girls, like her daughters.

84.    Under HB 710, Cull worries that Eagle's youth are missing out on transformational, important, First Amendment-protected materials and will thus lose out on building lifelong skills in empathy and understanding.  Cull also worries that Eagle's youth will be less prepared to face life's harder struggles as a result of HB 710.

85.    Cull wants her children to have free and open access to constitutionally protected materials.  Since the removal and reshelving of 23 titles in the Eagle Public Library, Cull fears that her children and others will face stigma for seeking out allegedly "inappropriate" books, or that they will avoid otherwise valuable literature altogether.

**B.  DEFENDANTS**

86.    Defendant Raúl Labrador is the Attorney General of the State of Idaho.  He is sued in his official capacity only, as the state's Attorney General, a position in which he acts under color of law to enforce HB 710.  *See* Idaho Code § 18-1517B(5).

87.    Defendant Jan Bennetts is the Ada County Prosecuting Attorney.  She is sued in her official capacity only, as the county prosecuting attorney in a county in which Plaintiffs are located and in which she acts under color of law to enforce HB 710.  *See* Idaho Code § 18-1517B(5).

88.    Defendant Justin Coleman is the Nez Perce County Prosecuting Attorney.  He is sued in his official capacity only, as a county prosecuting attorney in a county in which Plaintiffs are located and in which he acts under color of law to enforce HB 710.  *See* Idaho Code § 18-1517B(5).

89.    Defendant Brian Naugle is the Valley County Prosecuting Attorney.  He is sued in his official capacity only, as a county prosecuting attorney in a county in which Plaintiffs are located and in which he acts under color of law to enforce HB 710.  *See* Idaho Code § 18-1517B(5).

90.    Defendant Jane or John Doe is the individual who sent notices to the Eagle Public Library requesting that 23 books be removed from circulation or relocated pursuant to Idaho Code § 18-1517B(3).

91.    The Eagle Public Library is a department of the City of Eagle.  Defendant Board of Trustees of the Eagle Public Library is the institution responsible for responding to written notices requesting removal or relocation of library materials.  *See* Idaho Code § 18-1517B(3). Pursuant to such requests, the Eagle Public Library Board of Trustees has removed three books from library shelves and relocated twenty others.

## IV.    FACTUAL ALLEGATIONS

92.    Following enactment by the Idaho Legislature, Idaho Governor Brad Little signed HB 710 into law on April 10, 2024.

93.    The law took effect on July 1, 2024.

94.    HB 710 amended Idaho Code Section 18-1514 to amend the law's definitions of certain terms concerning "obscene materials," and created a new provision, Section 18-1517B, entitled the "Children's School and Library Protection Act."

### A.  HB 710'S STRUCTURE AND SCOPE

95.    Although verbose, vague, and ambiguous, HB 710 can best be broken into three main components: (1) substantive prohibition, (2) definitions, and (3) enforcement.

96.    The substantive prohibition and enforcement provisions are found in HB 710's newly created statutory provision, Idaho Code Section 18-1517B, while the definitions are listed in Idaho's variable obscenity statute, Section 18-1514.

### 1.  The Substantive Prohibition.

97.    HB 710's substantive prohibition provides as follows:

Notwithstanding any other provision of law, a school or public library, or an agent thereof, shall not promote, give, or make available to a minor:

> **(a)** Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body that depicts nudity, sexual conduct, or sado-masochistic abuse and that is harmful to minors;
>
> **(b)** Any book, pamphlet, magazine, printed matter however reproduced, or sound recording that contains any matter pursuant to paragraph (a) of this subsection or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sado-masochistic abuse and that, taken as a whole, is harmful to minors; or
>
> **(c)** Any other material harmful to minors.

Idaho Code § 18-1517B(2).

### 2. The Definitional Provisions.

98.    The scope of HB 710's substantive prohibition turns primarily on the following definition of "harmful to minors":

> "Harmful to minors" includes in its meaning the quality of any material or of any performance or of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:
>
> **(a)** Appeals to the prurient interest of minors as judged by the average person, applying contemporary community standards; and
>
> **(b)** Depicts or describes representations or descriptions of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse which are patently offensive to prevailing standards in the adult community with respect to what is suitable material for minors and includes, but is not limited to, patently offensive representations or descriptions of:
>
> > **(i)** Intimate sexual acts, normal or perverted, actual or simulated; or
> >
> > **(ii)** Masturbation, excretory functions or lewd exhibition of the genitals or genital area. Nothing herein contained is intended to include or proscribe any matter which, when considered as a whole, and in context in which it is used, possesses serious literary, artistic, political or scientific value for minors.

Idaho Code § 18-1514(6).

99.    Notably, while the definition of "harmful to minors" appears to incorporate the first two prongs of the *Miller* test for obscenity, its reference to the final prong is vague, unstructured, and confusing.  *See Miller*, 413 U.S. at 24.

100.    Specifically, while it appears the last sentence of Section 18-1514(6)(b)(ii) is meant to capture the final prong of the *Miller* test to some extent, its placement within HB 710's statutory scheme demonstrates that its application is limited only to material that includes representations or descriptions of "[m]asturbation, excretory functions or lewd exhibition of the genitals or genital area" — only a small subset of the topics or acts HB 710 targets.

101.    Works that describe *any* other topic or act, "including intimate sexual acts," are thus subject to the Act's prohibition even if they, taken as a whole, <u>do</u> have "serious literary, artistic, political, or scientific value" — a result directly at odds with the Supreme Court's holding in *Miller*.

102.    The Act's substantive prohibition must also be read in conjunction with other statutorily defined terms — each of which further confuses, rather than clarifies, the scope and applicability of the Act's substantive prohibition.

103.    For example, HB 710 defines "minor" as "any person less than eighteen (18) years of age" and, in doing so, fails to distinguish between younger and older "minors."   Idaho Code § 18-1514(1).

104.    Accordingly, when read in conjunction with the definition of "minor," the term "harmful to minors" necessarily means materials considered harmful *to the youngest of minors* without regard as to whether such materials would be appropriate for, and not harmful to, the oldest of minors.

105.    The Act's definition of "sexual conduct," is particularly troubling in the way it subjects, and thereby targets, "any act of . . . *homosexuality*" — but not any act of *heterosexuality* — to its substantive prohibitions no matter how innocuous or non-sexual such act may be.  Idaho Code § 18-1514(3)

106.    The Act defines "sexual conduct" as follows:

> "Sexual conduct" means any act of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, the breast.

*Id.*

107.    Importantly, "any act of *heterosexuality*" is not included in the Act's definition of "sexual conduct," leaving reasonable and appropriate room to conclude that certain "acts of heterosexuality" are, by their very nature or within context, not sexual.  In fact, by application of this definition, an act of *heterosexuality* would constitute "sexual conduct," and thus be subject to HB 710's substantive prohibitions, only if such act constituted an act of "masturbation . . . sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, the breast."  By contrast, however, by including "any act of . . . homosexuality" in the list of conduct deemed inherently sexual by operation of this definition, "acts of homosexuality" do not enjoy the same room for reasonable context and analysis.  Rather, by its very terms, the Act deems "any act of homosexuality" necessarily sexual, thereby subjecting any such "act of homosexuality" — no matter how innocuous or non-obscene in nature — to the Act's substantive prohibition.

108.    The Act defines "material" broadly, and incoherently, to mean "anything tangible which is harmful to minors, whether derived through the medium of reading, observation or sound."  Idaho Code § 18-1514(7).

### 3. The Enforcement Provisions.

109.    To enforce its ban on "material harmful to minors," HB 710 creates public and private causes of action against schools and libraries.

110.    Under HB 710, all schools and public libraries must "have a policy and readily accessible form allowing a person to request review of material the person considers to be harmful to minors." Idaho Code § 18-1517B(7).

111.    HB 710 provides that a "county prosecuting attorney or the attorney general shall have a cause of action for injunctive relief against any school or public library that violates" the law's prohibition against "promot[ing], giv[ing], or mak[ing] available to a minor" any "material harmful to minors." *See* Idaho Code §§ 18-1517B(5), (2).

112.    HB 710 also provides for an administrative review process, private cause of action, and statutory damages that "[a]ny minor who obtains material [harmful to minors]," as well as their parents and legal guardians, may pursue against schools and libraries. *See* Idaho Code § 18-1517B(3)–(4).

113.    Any such minor or their parent or legal guardian may "provide[] written notice to the school or public library asking for the relocation of such material [harmful to minors which the minor obtained] to a section designated for adults only." Idaho Code § 18-1517B(3)(b).

114.    If, after 60 days of receiving such written notice, the "institution's library board or board of trustees failed to relocate the material harmful to minors to an area with adult access only," the minor or their parent or legal guardian may bring a private cause of action against the institution to recover $250 in statutory damages, actual damages, and injunctive relief. Idaho Code § 18-1517B(3)–(4).

115.    The statute does not specify whether the $250 statutory penalty is per action, per book deemed "harmful to minors," or per plaintiff.

116.    HB 710 provides that a school or library has an affirmative defense to civil liability under the law if it "[h]ad reasonable cause to believe that the minor involved was" at least 18, or if the minor was accompanied by an adult who "signed a written statement" asserting parental or legal guardianship.  Idaho Code § 18-1517B(6).  But, absent these circumstances, if the school or library "failed to take reasonable steps to restrict access by minors to material harmful to minors," it will be subject to liability.  *See* Idaho Code § 18-1517B(3)(a).  Making matters worse, reports indicate that insurers serving public libraries and schools across Idaho may refuse to cover the costs stemming from such liability.

117.    For classroom and school libraries, HB 710 thus forces local libraries to sequester such materials to a fully monitored, cordoned-off, adults-only section, remove these materials from the library entirely, or ban minors from the library altogether.

**B.  GOVERNOR LITTLE'S 2023 VETO OF A PREVIOUS ITERATION OF THE BOOK BAN LAW**

118.    HB 710 is the culmination of multiple attempts by the Idaho Legislature to restrict minors' access to books.

119.    For example, in 2023, House Bill 314 nearly became law.  House Bill 314 would have imposed similar restrictions on schools and libraries as HB 710, but it created an even more draconian bounty system than HB 710: under the 2023 bill, private individuals who sued successfully under the law could recover statutory damages of $2,500 (10 times the statutory damages in HB 710).

120.    Governor Brad Little ultimately vetoed House Bill 314, and the House failed by a single vote to override the veto.

121.    In a letter to legislators explaining his veto of House Bill 314, Governor Little wrote that his "main concern is that the bill's ambiguity will have unintended consequences for Idaho

libraries and their patrons.  This legislation makes sweeping, blanket assumptions on materials that could be determined as 'harmful to minors' in a local library, and it will force one interpretation of that phrase onto all the patrons of the library."  Governor Little also expressed concerns about the "$2,500 in automatic fines creat[ing] a library bounty system that will only increase the costs local libraries incur" and the possibility that those costs would be passed along to Idaho taxpayers or "cause the libraries to close to minors altogether."

122.    Although, compared to the 2023 bill, HB 710 imposes a lower damages amount and eliminates a portion of the vague and overbroad House Bill 314 language, much of the same "ambiguity" about which Governor Little expressed concern in his House Bill 314 veto remains in HB 710.  This is particularly true of the "sweeping, blanket assumptions on materials that could be determined as 'harmful to minors'" about which Governor Little expressed concern.

### C.  CONTINUED CONFUSION OVER HB 710'S SCOPE AND APPLICABILITY

123.    Upon signing HB 710 on April 10, 2024, Governor Little wrote in a letter to House Speaker Mike Moyle that HB 710 "addresses most, but not all, of the concerns [he] outlined in [his] veto letter last year" regarding House Bill 314.  He noted that HB 710 "reduces damages from $2,500 to $250," and allows schools and libraries to avoid liability if they restrict access to "materials of concern within 60 days" of receiving a formal complaint about the materials.

124.    Governor Little further noted that, "[c]ompared to last year's legislation, [HB 710] also tightens the definition of what is considered 'harmful to minors,' providing greater clarity for local libraries and their patrons."

125.    Governor Little ended the letter with the following: "[w]hile I have signed [HB 710], like many Idahoans, I will be watching the implementation and outcomes of this legislation very closely."

126.    Even before taking effect on July 1, 2024, HB 710 had an immediate and dramatic impact on libraries across Idaho, as libraries and schools struggled to discern the law's scope and how to comply with it.

127.    Two days after HB 710 was signed into law, the Idaho Library Association ("ILA") requested clarification from Governor Little's office on the law's scope and meaning.  Specifically, the ILA asked about Governor Little's statement in his signing letter that the law "tighten[ed] the definition of what is considered 'harmful to minors'" compared with the 2023 bill — noting that the ILA "did not see that in the bill," and that "Libraries are not quite sure how they should operate under this law."

128.    The ILA received no response to its request for clarification.

### D.  HB 710'S VAGUE AND OVERBROAD VIEWPOINT-BASED RESTRICTIONS HAVE HAD A SEVERE CHILLING EFFECT ON PLAINTIFFS' EXERCISE OF THEIR FIRST AMENDMENT RIGHTS

#### 1.  Obscenity, Minors, and the First Amendment.

129.    The First Amendment prohibits the State from imposing vague, overbroad, and/or content-based restrictions on public schools' and libraries' ability to provide minors with non-obscene speech and materials.  *See Erznoznik*, 422 U.S. at 213-14.

130.    In *Miller*, the Supreme Court set forth the primary legal test for determining whether expression constitutes obscenity and is therefore not protected under the First Amendment.  Under that test, a work will be found to be obscene if (i) the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (ii) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (iii) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.  *Miller*, 413 U.S. at 93.

131.    Additionally, when applied to minors, *Miller*'s obscenity standard must account for the age of the reader.  A book is not obscene as to minors if it has serious value for a legitimate subset of minors, such as older minors.  *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 388 (1988).

132.    By regulating the availability of materials that are neither obscene under the *Miller* test nor obscene as to the oldest of minors — let alone the oldest of public school students — HB 710 violates Plaintiffs' First Amendment rights.

### 2.  The Effects of HB 710.

133.    The constitutional harms created by HB 710 have already become evident.

134.    HB 710 leaves public libraries and schools — particularly those with limited resources, space, or both — only a Hobson's choice.  Public schools and libraries must either accommodate the age restrictions HB 710 demands or risk litigation from public and private litigants.  *See* Idaho Code § 18-1517B(3)-(5).

135.    HB 710's 60-day notice procedure does nothing to quell this risk, as that procedure necessarily results in either the relocation of the material being challenged or the grant of a private right of action to the challenger.  *See* Idaho Code § 18-1517B(3).

136.    For example, after receiving 23 such notices, the Board of Trustees of the Eagle Public Library moved 20 books to adult-only areas of the library and placed 3 others behind the circulation desk, making them entirely unavailable to minors without written permission from a parent or guardian.

137.    HB 710 also provides county prosecuting attorneys and the attorney general with a cause of action against any school or public library that violates its substantive provision without the need for any prior notice or challenge process.  *See* Idaho Code § 18-1517B(5).

138.    In short, HB 710 has forced public libraries, school libraries, and librarians within the State to take extreme steps to minimize challenges and litigation under the Act.

139.    Public Library Plaintiff the Donnelly Library recently announced that, given space constraints in its 1,024-square-foot log cabin library building that cannot accommodate the age restrictions HB 710 demands, together with a strained financial situation that makes bearing the risk of litigation and statutory damages untenable, the library would be closing its doors entirely to any minors unaccompanied by a parent or guardian in May 2024.

140.    The Donnelly Library's adult-only policy threatened to shutter the library's after-school program — the only option for after-school childcare in the small, rural town of Donnelly.

141.    After attempts to entirely re-locate its after-school programing to teepees set up outside its library building, the Donnelly Library implemented a three-part waiver program in an effort to allow children to enter the library without a parent or guardian present.

142.    The option of executing a waiver does little to mitigate the risk of harm imposed by HB 710, which provides no safe harbor for libraries that implement a waiver program like Donnelly's. *See* Idaho Code § 18-1517B.

143.    Implementation of the adult-only policy and the requirement that any children wishing to enter the library first obtain a waiver from a parent or guardian not only creates stigma and severely limits patrons' access to the library and the materials it houses, but these changes have also resulted in a drastic year-over-year reduction in library membership and participation in its after-school programs.

144.    Public School Librarian Plaintiff Nichols has also been forced to remove nearly 40 titles from the Rocky Mountain library, due to a district policy aimed at reducing the threat of litigation and statutory damages pursuant to HB 710.

145.    These titles include *I'll Give You the Sun* by Jandy Nelson, *The Perks of Being a Wallflower* by Stephen Chbosky, and *Slaughterhouse-Five* by Kurt Vonnegut, among others.

146.    The removal of these titles from the Rocky Mountain library will directly impact students' rights to receive these constitutionally protected materials.  For example, Public School Student Plaintiff Olivia Lanzara, an incoming Senior at Rocky Mountain, will be unable to directly access classic and immensely popular books from her public school library, like *I Know Why The Caged Bird Sings* by Maya Angelou, notwithstanding the fact that she is no longer a minor.

147.    As a result of HB 710's overbroad and vague prohibitions, many young Idahoans have lost the ability to access their libraries' vast general collections and are instead confined to limited collections and/or child-specific sections.

148.    HB 710's vague and overly broad prohibitions have also resulted in the removal from public libraries and schools of books authored by the Author Plaintiffs and/or published by the Publisher Plaintiffs — many of which have enjoyed unobstructed access on library shelves for decades due to their great value to readers and none of which contain any material that is "obscene" or "harmful to minors" as those terms are defined in *Miller* and its progeny.

149.    Author Malinda Lo has already had her work censored by at least two public libraries in Idaho.  *Last Night at the Telegraph Club*, which deals with many LGBTQ+ themes, can no longer be found in the Rocky Mountain library and has been relocated to the adult section of the Eagle Public Library.

150.    Author David Levithan expects that his novel *Two Boys Kissing* is or will soon be unavailable to many young Idaho readers, particularly since that title has been banned pursuant to other similar book ban laws.

151.    Author Dashka Slater likewise foresees her book, *The 57 Bus: A True Story of Two Teenagers and the Crime That Changed Their Lives*, which features a transgender character and

discusses themes of race and criminal justice, will be relocated to adult-only areas of Idaho libraries.

## V.    CLAIMS FOR RELIEF

### CLAIM ONE:
### FIRST AMENDMENT – OVERBREADTH
#### (All Plaintiffs Against All Defendants)

152.    All prior paragraphs are incorporated herein by reference as if fully set forth herein.

153.    A statute is unconstitutionally overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).

154.    "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) (plurality opinion).

155.    HB 710 is overbroad for several reasons.

156.    In *Miller v. California*, the United States Supreme Court defined "obscenity" as "works which, taken as a whole, [a] appeal to the prurient interest in sex, [b] which portray sexual conduct in a patently offensive way, and [c] which, taken as a whole, do not have serious literary, artistic, political, or scientific value."  413 U.S. at 23–24.

157.    While the third *Miller* prong receives passing mention in HB 710, its application is limited only to works that represent or describe "[m]asturbation, excretory functions or lewd exhibition of the genitals or genital area."  Idaho Code § 18-1514(6)(i)–(ii).

158.    The failure to properly incorporate the third prong of the *Miller* obscenity standard into HB 710's definition of material "harmful to minors" fails to omit from its overbroad sweep materials which, "taken as a whole," do have "serious literary, artistic, political, or scientific

value." In other words, the Act extends far beyond the bounds of banning only material which is legally obscene.

159.    Even if HB 710 could somehow be interpreted to incorporate all three prongs of the *Miller* standard with respect to all materials within its reach, it is nevertheless unconstitutionally overbroad given the manner in which it lumps together all Idahoans under the age of 18, without regard to the constitutional reality that material not appropriate for the youngest of minors may be appropriate and of significant value to older minors.

160.    A book is not obscene as to minors if it has serious value for a legitimate subset of minors, such as older minors. *See Am. Booksellers Ass'n, Inc.*, 484 U.S. at 388; *Erznoznik*, 422 U.S. at 213–14.

161.    By defining "minor" broadly as any individual under the age of 18, the Act's substantive prohibition necessarily attaches to materials considered harmful to the youngest of minors. This definition thus restricts *all* minors' access to such materials without acknowledging the constitutional reality that what may be obscene for the youngest of minors may nevertheless be appropriate and of significant value to the oldest of minors.

162.    HB 710 also regulates substantially more speech than the First Amendment permits by failing to properly define a host of terms — including, but not limited to, "harmful to minors," "minor," "matter," "adults only," "access," "relocate," and "promote, give, or make available" — and, further, discriminates based on viewpoint by singling out books describing "any act . . . of homosexuality" via its overbroad definition of "sexual conduct." Idaho Code §§ 18-1514(3).

163.    The chilling effect of HB 710 further underscores its overbreadth.

164.    This overbreadth violates the First Amendment to the United States Constitution as to the Publisher Plaintiffs and Author Plaintiffs because it interferes with their editorial discretion

to select, and make available, constitutionally protected materials to whom they desire and to distribute constitutionally protected materials, including to their target audiences.

165.    This overbreadth unconstitutionally chills the Public Library and Public School Librarian Plaintiffs from making available to minors age-appropriate books with serious literary, artistic, political or scientific value, and interferes with their rights to determine within their own professional judgment which materials to make available to library patrons and students, and unconstitutionally chills them from activity protected under the First Amendment.

166.    This overbreadth violates the First Amendment as to the Student, Parent, and Eagle Plaintiffs because it interferes with the Student Plaintiffs' right to receive information and ideas protected by the First Amendment, *Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 867–68 (1982) (plurality opinion), and generates potential stigma surrounding reading, writing about, or talking about books broadly deemed "harmful to minors" under the law.

## CLAIM TWO:
## FOURTEENTH AMENDMENT & FIRST AMENDMENT – VAGUENESS
### (All Plaintiffs Against All Defendants)

167.    All prior paragraphs are incorporated herein by reference as if fully set forth herein.

168.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits statutes that are so impermissibly vague that an ordinary person would not understand what conduct the statute regulates or so standardless as to invite arbitrary enforcement. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

169.    When a law "threatens to inhibit the exercise of constitutionally protected rights," including First Amendment rights, a "more stringent vagueness test" applies.  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

170.    HB 710 includes terms that are vague, indefinite, arbitrary, and subject to different meanings such that they fail to provide adequate notice of the obligations they create, in violation of the Fourteenth Amendment to the United States Constitution.

171.    In particular, the terms "harmful to minors," "matter," "minor," "adults only," "access," "promote, give, or make available," and "sexual conduct" are vague and confusing in that they provide no guidance as to what is covered and/or required under HB 710.  *See* Idaho Code § 18-1514.

172.    HB 710 also leaves entirely unclear the meaning of the term "any act of . . . homosexuality" in its description of "sexual conduct."  Idaho Code § 18-1514(3).

173.    Neither does HB 710 define the term "relocate" as it pertains to notices for relocation of materials to an "adult-only" section, nor outline what constitutes an "adult-only" section in compliance with the law.  Idaho Code § 18-1517B(3).

174.    HB 710's vague and confusing terms provide wholly insufficient guidelines or standards to determine what materials should be deemed "harmful to minors" and thus restricted under its provisions.

175.    The Act's vagueness thus invites those tasked with enforcing its provisions to pursue their own personal viewpoints, predilections, or biases and, as such, arbitrarily suppresses and chills First Amendment liberties.  Such chilling effect is only exacerbated by HB 710's two-pronged enforcement mechanism, which provides law enforcement and ordinary citizens — including individuals without any experience, let alone expertise, in enforcement, statutory interpretation, or constitutional principles — with the power to enforce its terms.

176.    This vagueness violates the Fourteenth Amendment to the United States Constitution as to the Public Library and Public School Librarian Plaintiffs because HB 710 fails

to put them on notice as to what conduct exposes them to book challenge reviews, litigation, and liability under HB 710.

177.    As a result of this vagueness, constitutionally protected materials have been, and are at risk of being, suppressed and chilled in violation of the First Amendment.

178.    HB 710's vagueness further interferes with Publisher Plaintiffs' and Author Plaintiffs' ability to make their constitutionally protected works available to young readers. Without such access, Student Plaintiffs are denied their rights to read and receive information, and the Eagle and Parent Plaintiffs are denied their rights to choose the materials to which their children have access.

## CLAIM THREE:
## FIRST AMENDMENT – VIEWPOINT DISCRIMINATION
### (All Plaintiffs Against All Defendants)

179.    All prior paragraphs are incorporated herein by reference as if fully set forth herein.

180.    Viewpoint discrimination is an egregious form of content-based discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. *Rosenberger*, 515 U.S. at 829.

181.    Public libraries and public school libraries across Idaho are, at a minimum, limited purpose public forums in which content-based restrictions must be both reasonable and viewpoint-neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).  HB 710 fails on both fronts.

182.    HB 710 is not viewpoint neutral, because it discriminates against specific viewpoints by singling out books describing "any act of . . . homosexuality" through Idaho law's definition of "sexual conduct."  Idaho Code §§ 18-1514(3); 18-1517B.

183.    Idaho law's relevant definition of "sexual conduct" includes several specific physical acts, including "sexual intercourse," "masturbation," or any "physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or . . . female[] breast."  Idaho Code § 18-1514(3).

184.    The definition of "sexual conduct" also includes "any act of homosexuality."  Idaho Code § 18-1514(3).

185.    The definition of "sexual conduct" does not include "any act of *hetero*sexuality" or further define what specific conduct constitutes an "act of homosexuality."

186.    The inclusion of this language in the law's definition of "sexual conduct" demonstrates that HB 710 is intended to specifically restrict access to, and stigmatize, books that portray anything having to do with LGBTQ+ characters.

187.    As a result of this viewpoint discrimination, books that address LGBTQ+ themes or portray LGBTQ+ characters are being restricted in, removed from, and stigmatized in Idaho public schools and public libraries, including books that are authored and published by the Author Plaintiffs and Publisher Plaintiffs.

188.    The Public Library and Public School Librarian Plaintiffs must decide between risking challenges, litigation, and penalties under HB 710 and removing books which portray relationships or romantic encounters between LGBTQ+ characters that would not otherwise qualify as material "harmful to minors" under HB 710's definition.

189.    Due to this viewpoint discrimination, the Student Plaintiffs are being deprived of their right to access certain books featuring LGTBQ+ characters and exploring LGBTQ+ themes, and risk potential stigma surrounding reading, writing about, or talking about these books. Similarly, this viewpoint discrimination impacts the Eagle Plaintiff's and Parent Plaintiffs' wishes for their children to read books featuring LGTBQ+ characters and exploring LGBTQ+ themes.

**CLAIM FOUR:**
**FOURTEENTH AMENDMENT – EQUAL PROTECTION**
**(All Plaintiffs Against All Defendants)**

190.    All prior paragraphs are incorporated herein by reference as if fully set forth herein.

191.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution constrains the ability of state actors from discriminating on the basis of gender identity or sexual orientation. This includes taking official action motivated by discriminatory animus based on sexual orientation.

192.    As discussed above, HB 710 discriminates against specific viewpoints by singling out books describing "any act of . . . homosexuality" through Idaho law's definition of "sexual conduct." Idaho Code §§ 18-1514(3); 18-1517B.

193.    This language is evidence that HB 710 targets books based on prohibited animus.

194.    And, in fact, many books that have already been restricted for access, removed from library collections altogether, or targeted for removal under HB 710 are books that portray relationships or romantic encounters between LGBTQ+ characters and which would not otherwise fall within HB 710's scope if not for the Act's targeting of books describing "any act of . . . homosexuality."

195.    As a result of this discriminatory animus, authors of books that portray relationships or romantic encounters between LGBTQ+ characters – many of whom are LGBTQ+ themselves – are subject to their books being removed or restricted from libraries on discriminatory grounds.

196.    Public Library and Public School Librarian Plaintiffs must choose between removing or restricting access to books based on discriminatory grounds or subjecting their libraries and schools to onerous book challenge review procedures, liability, and monetary penalties for refusing to do so.

197.    As a further result of this discriminatory animus, Student Plaintiffs are being denied access to books portraying relationships or romantic encounters between LGBTQ+ characters or exploring LGBTQ+ themes on discriminatory grounds.  The rights of Eagle and Parent Plaintiffs to choose the books their children can access are similarly impaired.

198.    Such conduct violates the Equal Protection Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

A.    Declare that HB 710 violates the First and Fourteenth Amendments and is therefore unconstitutional, void, and of no effect;

B.    Issue preliminary and permanent injunctive relief restraining Defendants and their agents, attorneys, servants, employees, successors in office, and other representatives, from enforcing HB 710 in any manner whatsoever;

C.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1998; and

D.    Grant such other and additional relief as the Court deems just or appropriate.

Dated: February 4, 2025                    Respectfully submitted,

By: /s/Deborah A. Ferguson

Deborah A. Ferguson
FERGUSON DURHAM, PLLC

Michael J. Grygiel
Daniela del Rosario Wertheimer

CORNELL LAW SCHOOL FIRST
AMENDMENT CLINIC[1]

*Attorneys for Plaintiffs*

---

[1] Clinic students Paul Janes, Celina Rivernider, and Alexander Strohl drafted portions of this complaint. The First Amendment Clinic is housed within Cornell Law School and Cornell University in Ithaca, NY. Nothing in this complaint should be construed to represent the views of these institutions, if any.